UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 04-20727-Civ-Martinez/Klein

BANCO INTERCONTINENTAL, S.A.,
 duly represented by La Comisión de Liquidación
Administrativa del Banco Intercontinental, S.A.,

       Plaintiff,

vs.

LUIS ALVAREZ RENTA, BANKINVEST S.A.,
INTERDUTY FREE, LTD., and WADEVILLE
INVESTMENTS, LTD.,

       Defendants.

_____/



### AMENDED COMPLAINT

Plaintiff, Banco Intercontinental, S.A., a banking institution organized and established in

accordance with the laws of the Dominican Republic, which is duly represented by La Comisión de

Liquidación Administrativa del Banco Intercontinental, S.A., sues Luis Alvarez Renta, Bankinvest

S.A., Interduty Free, Ltd., and Wadeville Investments, Ltd., and alleges:

### Nature of Action

1.      This is an action arising out of Defendants' violations of the Racketeer Influenced and

Corrupt Organizations Act, 18 U.S.C. §§1961-1968, and fraudulent transfers pursuant to

Chapter 726, Fla. Stat. This case emanates from the Defendants' misuse of United States financial

institutions to transfer illicit monies stolen from a foreign bank. The Defendants' racketeering

activities included criminal violations of the wire fraud, national stolen property, and money

laundering statutes. The Defendants' scheme involved the hiding of stolen funds in United States

bank accounts and other personal and real property located in South Florida and elsewhere in the United States. In the process of committing these racketeering acts and fraudulent transfers, the Defendants compromised Miami banks and professionals who assisted in this illegal activity.

2.      Plaintiff seeks compensatory damages in excess of $34 million, plus treble damages under the RICO claims, along with interest, attorneys' fees, and the costs of this action. Plaintiff thus seeks a recovery of damages from Defendants in excess of $102 million. Plaintiff further seeks injunctive relief, pursuant to Chapter 726, Florida Statutes, against the disposition by the Defendants or transferees, or both, of the assets and other property obtained as a result of the fraudulent transfers described herein.

### The Parties

3.      Plaintiff Banco Intercontinental, S.A. ("Baninter") is a banking institution organized and established in accordance with the laws of the Dominican Republic. Baninter, which is currently in the process of liquidation, is duly represented by La Comisión de Liquidación Administrativa del Banco Intercontinental, S.A. appointed under the laws of the Dominican Republic by that country's monetary board.

4.      Defendant Luis Alvarez Renta ("Alvarez Renta") is a citizen of the United States who resides in Coral Gables, Florida, and in the Dominican Republic.

5.      Defendant Bankinvest S.A. ("Bankinvest") is a corporation formed under the laws of the Dominican Republic which committed wrongful acts, and which benefitted from wrongful acts committed, in Miami-Dade County, Florida, as described in this Amended Complaint. At all times relevant to the allegations in this Amended Complaint, Bankinvest maintained at least one bank account in Miami, Florida which related to the subject matter of this lawsuit.

-2-

6.      Interduty Free, Ltd. ("Interduty") is a company formed under the laws of the British Virgin Islands which committed wrongful acts, and which benefitted from wrongful acts committed, in Miami-Dade County, Florida, as described in this Amended Complaint.  At all times relevant to the allegations in this Amended Complaint, Interduty maintained at least one bank account in Miami, Florida which related to the subject matter of this lawsuit.

7.      Wadeville Investments, Ltd. ("Wadeville") is a company formed under the laws of the British Virgin Islands which committed wrongful acts, and which benefitted from wrongful acts committed, in Miami-Dade County, Florida, as described in this Amended Complaint.  At all times relevant to the allegations in this Amended Complaint, Wadeville maintained at least one bank account in Miami, Florida which related to the subject matter of this lawsuit.

### Jurisdiction and Venue

8.      This Court has:  (a) federal jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and the Racketeer Influenced and Corrupt Organizations Act of 1970, 18 U.S.C. §§1961-1968 (hereinafter "RICO"); and (b) supplemental jurisdiction over the subject matter of this action under 28 U.S.C. § 1367.

9.      Defendant Alvarez Renta is subject to personal jurisdiction in this forum because Alvarez Renta resides in Florida, committed the wrongs described herein in Florida, and engages in continuous and not isolated business in Florida.

10.     Defendant Bankinvest is subject to personal jurisdiction in this forum because it transacted business in Florida, the wrongs described herein were committed in Florida, and it engages in continuous and not isolated business in Florida.

-3-

11.     Defendant Interduty is subject to personal jurisdiction in this forum because it transacted business in Florida, the wrongs described herein were committed in Florida, and it engages in continuous and not isolated business in Florida.

12.     Defendant Wadeville is subject to personal jurisdiction in this forum because it transacted business in Florida, the wrongs described herein were committed in Florida, and it engages in continuous and not isolated business in Florida.

13.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(a) because a substantial part of the events or omissions giving rise to the claims herein occurred in this venue, and a substantial part of the property that is subject to this action is situated in this venue.  Moreover, Defendant Alvarez Renta resides in Miami-Dade County, Florida.

## General Allegations

**A.     Defendants' Scheme to Use Miami Banks to Transfer and Hide Funds Stolen From Baninter**

14.     Baninter was the third largest commercial bank in the Dominican Republic.

15.     Under the direction of its President and major shareholder, Ramon Baez Figueroa ("Baez Figueroa"), Baninter's resources were used to build an extensive business empire that included, among other assets in addition to the banking assets, gas interests and media outlets such as the largest newspaper in the nation, four television stations, and more than 70 radio stations.

16.     Alvarez Renta was a business consultant for Baninter.

17.     Alvarez Renta and Baez Figueroa stole funds deposited at Baninter to enrich themselves, their relatives, and companies that they controlled.  The scheme, orchestrated in large part from Alvarez Renta's base of operations in South Florida, involved the creation of a "bank

-4-

within a bank" to use funds deposited at Baninter to buy companies controlled by certain officers and directors of Baninter and for extravagant purchases of vacation homes, airplanes, yachts, helicopters, and luxury automobiles, among other assets.  To facilitate the transfer of illicitly obtained assets, including the transfer of such assets to Florida, it was part of the scheme to keep that depletion of funds off of Baninter's official books and records.

18.     While Alvarez Renta and Baez Figueroa drained funds from Baninter, the bank began to experience financial difficulties, and it sought funds from the Central Bank of the Dominican Republic to meet its obligations to depositors.  Instead of solely using funds from the Central Bank to meet Baninter's obligations to the depositors, Alvarez Renta and Baez Figueroa used those funds to further their scheme.

19.     In early 2003, Baez Figueroa sought to sell Baninter to another financial institution. In performing its due diligence, the prospective purchaser noticed irregular financial transactions, and eventually uncovered a computer system that documented the transactions of the "bank within a bank." Baez Figueroa was unable to sell Baninter.

20.     In early 2003, the monetary board took the necessary steps to intervene in Baninter and, pursuant to Dominican law, later established, in the middle of 2003, La Comisión de Liquidación Administrativa del Banco Intercontinental, S.A., which assumed the legal representation of Baninter during the liquidation process.

21.     Alvarez Renta was the mastermind of this scheme and effectuated its core activities by conspiring with Baez Figueroa, establishing bank accounts with financial institutions in Miami, structuring transactions in which millions of dollars were stolen from Baninter and transferred to the United States, and directing the activities of other wrongdoers.

-5-

22.     Alvarez Renta owned and controlled Bankinvest through Dominican Enterprises, Inc., a Florida corporation based in Key Biscayne, Florida.   Dominican Enterprises, Inc. owned Bankinvest until August 2001, when it sold Bankinvest to a British Virgin Islands entity owned by Baez Figueroa.   The Bankinvest sale was structured with the involvement of a Miami-based partner of a prominent United States law firm.

23.     Notwithstanding the putative sale of Bankinvest, Alvarez Renta remained in control, and directed the operations, of Bankinvest, which maintained its bank accounts in Miami.

24.     Interduty was formed in 1996.  At the time that Interduty was formed and at all times thereafter, Alvarez Renta had authority to act, and did act, on behalf of Interduty in dealings with other parties.

25.     Wadeville was incorporated in 1997 in the British Virgin Islands.  At the time that Wadeville was formed and at all times thereafter, Alvarez Renta had authority to act, and did act, on behalf of Wadeville in dealings with other parties.

**B.     The United States Letter of Credit and Loan Scheme**

26.     As a part of the scheme implemented by Alvarez Renta and Baez Figueroa, Bankinvest and Interduty established accounts at several banks in Miami, Florida, including the International Bank of Miami, N.A. ("International Bank of Miami"), Hamilton Bank, N.A. ("Hamilton Bank"), and BankAtlantic (collectively, "the Miami Banks").

27.     As part of the scheme to plunder Baninter, Bankinvest and Interduty obtained numerous United States loans from the Miami Banks.  As devised by Alvarez Renta and Baez Figueroa through the scheme, such loans were guaranteed by letters of credit issued by Baninter in favor of the Miami Banks.  Bankinvest and Interduty never intended to repay such loans with their

-6-

own funds, and in fact they did not repay the United States loans with their own funds. Instead, such loans were used by Alvarez Renta and Baez Figueroa as vehicles to steal and defraud Baninter out of millions of dollars and to transfer the wrongfully obtained funds to Bankinvest and Interduty in the United States.

28.     Alvarez Renta and Baez Figueroa used Baninter funds to pay each of the loans extended by the Miami Banks to Bankinvest and Interduty. Baninter re-paid the United States loans in one of two ways: either the Miami Banks drew on the lines of credit that Baninter, through the guidance of Alvarez Renta and Baez Figueroa, had extended as guarantees to enable the Miami Banks to extend the loans to Bankinvest and Interduty; or Baninter, relying on the misrepresentations of Alvarez Renta and Baez Figueroa, wired the funds to the Miami accounts of Bankinvest and Interduty so that Bankinvest and Interduty could repay the United States loans with Baninter funds.

29.     As a further part of the scheme to defraud Baninter, Alvarez Renta and Baez Figueroa diverted moneys from Baninter by arranging for fraudulent loans from Baninter. These bogus loans were funded through wire transfers to Bankinvest's account at International Bank of Miami.

30.     The intended and actual end result of these transactions was to illegally transfer millions of dollars from Baninter in the Dominican Republic to Bankinvest and Interduty accounts in Miami. Bankinvest and Interduty never intended to compensate, and never did compensate, Baninter for the millions of dollars stolen from it through the transactions with the Miami Banks. Instead, each transaction that resulted in the theft of Baninter funds was followed by another such criminal transaction, and this criminal scheme did not end until regulatory authorities in the Dominican Republic intervened and obtained control of Baninter.

31.     Specific transactions include:

-7-

(a)     Through a scheme implemented by Alvarez Renta and Baez Figueroa, Baninter established a letter of credit in the amount of $1,000,000 in favor of Hamilton Bank in Miami to guarantee a $1,000,000 United States loan made to Interduty by Hamilton Bank. At no time did Interduty intend to repay this loan with its own funds (instead intending at all times that the funds to repay the loan would come from Baninter to the detriment of Baninter), and in fact did not do so. The loan was repaid in or about July 2000 with funds furnished by Baninter–not Interduty–through a wire transfer to Miami. The end result was that $1,000,000 of stolen funds was transferred from Baninter to Interduty using a United States loan at Hamilton Bank.

(b)     Through a scheme implemented by Alvarez Renta and Baez Figueroa, Baninter established a letter of credit in the amount of $1,650,000 in favor of International Bank of Miami to guarantee a $1,650,000 United States loan made to Bankinvest or Interduty by International Bank of Miami. At no time did Bankinvest intend to repay this loan with its own funds (instead intending at all times that the funds to repay the loan would come from Baninter to the detriment of Baninter), and in fact did not do so. The loan was repaid in or about November 2001 with funds furnished by Baninter–not Bankinvest–through a wire transfer to Miami. The end result was that $1,650,000 of stolen funds was transferred from Baninter to Bankinvest using a United States loan at International Bank of Miami.

(c)     Through a scheme implemented by Alvarez Renta and Baez Figueroa, Baninter established a letter of credit in the amount of $1,400,000 in favor of International Bank of Miami to guarantee a $1,400,000 United States loan made to Bankinvest by International Bank of Miami. At no time did Bankinvest intend to repay this loan with its

-8-

own funds (instead intending at all times that the funds to repay the loan would come from Baninter to the detriment of Baninter), and in fact did not do so. The loan was repaid in or about December 2001 with funds furnished by Baninter–not Bankinvest–through a wire transfer to Miami. The end result was that $1,400,000 of stolen funds was transferred from Baninter to Bankinvest using a United States loan at International Bank of Miami.

(d)     Through a scheme implemented by Alvarez Renta and Baez Figueroa, in or about December 2001, Baninter loaned $2,500,000 to Bankinvest through wires to Bankinvest's account at International Bank of Miami. At no time did Bankinvest intend to repay this loan from Baninter with its own funds (instead intending at all times that the funds would come from Baninter to the detriment of Baninter), and in fact did not do so. The end result was that $2,500,000 of stolen funds was transferred from Baninter to Bankinvest using an account at International Bank of Miami.

(e)     Through a scheme implemented by Alvarez Renta and Baez Figueroa, Baninter established a letter of credit in the amount of $1,000,000 in favor of International Bank of Miami to guarantee a $1,000,000 United States loan made to Bankinvest by International Bank of Miami. At no time did Bankinvest intend to repay this loan with its own funds (instead intending at all times that the funds to repay the loan would come from Baninter to the detriment of Baninter), and in fact did not do so. The loan was repaid in or about January 2002 with funds furnished by Baninter–not Bankinvest–through a wire transfer to Miami. The end result was that $1,000,000 of stolen funds was transferred from Baninter to Bankinvest using a United States loan at International Bank of Miami.

(f)     Through a scheme implemented by Alvarez Renta and Baez Figueroa, Baninter established a letter of credit in the amount of $1,500,000 in favor of International Bank of Miami to guarantee a $1,500,000 United States loan made to Bankinvest by International Bank of Miami.   At no time did Bankinvest intend to repay this loan with its own funds (instead intending at all times that the funds to repay the loan would come from Baninter to the detriment of Baninter), and in fact did not do so.  The loan was repaid in or about February 2002 with funds furnished by Baninter–not Bankinvest–through a wire transfer to Miami.  The end result was that $1,500,000 of stolen funds was transferred from Baninter to Bankinvest using a United States loan at International Bank of Miami.

(g)     Through a scheme implemented by Alvarez Renta and Baez Figueroa, Baninter established a letter of credit in the amount of $2,000,000 in favor of International Bank of Miami to guarantee a $2,000,000 United States loan made to Bankinvest by International Bank of Miami.   At no time did Bankinvest intend to repay this loan with its own funds (instead intending at all times that the funds to repay the loan would come from Baninter to the detriment of Baninter), and in fact did not do so.  The loan was repaid in or about February 2002 with funds furnished by Baninter–not Bankinvest–through a wire transfer to Miami.  The end result was that $2,000,000 of stolen funds was transferred from Baninter to Bankinvest using a United States loan at International Bank of Miami.

(h)     Through a scheme implemented by Alvarez Renta and Baez Figueroa, Baninter established a letter of credit in the amount of $375,000 in favor of Hamilton Bank to guarantee a $375,000 United States loan made to Interduty by Hamilton Bank.  At no time did Interduty intend to repay this loan with its own funds (instead intending at all times that

-10-

the funds to repay the loan would come from Baninter to the detriment of Baninter), and in fact did not do so. At a point after the loan was funded, it was assumed by BankAtlantic. Thereafter, the loan was repaid to BankAtlantic in or about February 2002 with funds furnished by Baninter–not Interduty–through a wire transfer to Miami. The end result was that $375,000 of stolen funds was transferred from Baninter to Interduty using an account at BankAtlantic in Miami.

(i)     Through a scheme implemented by Alvarez Renta and Baez Figueroa, Baninter established a letter of credit in the amount of $450,000 in favor of International Bank of Miami to guarantee a $450,000 United States loan made to Bankinvest by International Bank of Miami. At no time did Bankinvest intend to repay this loan with its own funds (instead intending at all times that the funds to repay the loan would come from Baninter to the detriment of Baninter), and in fact did not do so. The loan was repaid in or about March 2002 with funds furnished by Baninter–not Bankinvest–through a wire transfer to Miami. The end result was that $450,000 of stolen funds was transferred from Baninter to Bankinvest using a United States loan at International Bank of Miami.

(j)     Through a scheme implemented by Alvarez Renta and Baez Figueroa, Baninter established a letter of credit in the amount of $500,000 in favor of BankAtlantic to guarantee a $500,000 United States loan made to Interduty by BankAtlantic in Miami. At no time did Interduty intend to repay this loan with its own funds (instead intending at all times that the funds to repay the loan would come from Baninter to the detriment of Baninter), and in fact did not do so. The loan was repaid in or about March 2002 with funds furnished by Baninter–not Interduty–through a wire transfer to Miami. The end result was

-11-

that $500,000 of stolen funds was transferred from Baninter to Interduty using a United States loan at BankAtlantic in Miami.

(k)     Through a scheme implemented by Alvarez Renta and Baez Figueroa, in or about April 2002, Baninter loaned $1,313,162.12 to Bankinvest through wires to Bankinvest's account at International Bank of Miami.  At no time did Bankinvest intend to repay this loan with its own funds (instead intending at all times that the funds would come from Baninter to the detriment of Baninter), and in fact did not do so.  The end result was that $1,313,162.12 of stolen funds was transferred from Baninter to Bankinvest using an account at International Bank of Miami.

(l)     Through a scheme implemented by Alvarez Renta and Baez Figueroa, Baninter established a letter of credit in the amount of $650,000 in favor of International Bank of Miami to guarantee a $650,000 United States loan made to Bankinvest by International Bank of Miami.   At no time did Bankinvest intend to repay this loan with its own funds (instead intending at all times that the funds to repay the loan would come from Baninter to the detriment of Baninter), and in fact did not do so.  The loan was repaid in or about April 2002 with funds furnished by Baninter–not Bankinvest–through a wire transfer to Miami.  The end result was that $650,000 of stolen funds was transferred from Baninter to Bankinvest using a United States loan at International Bank of Miami.

(m)    Through a scheme implemented by Alvarez Renta and Baez Figueroa, Baninter established a letter of credit in the amount of $504,000 in favor of BankAtlantic in Miami to guarantee a $504,000 United States loan made to Interduty by BankAtlantic.   At no time did Interduty intend to repay this loan with its own funds (instead intending at all

-12-

times that the funds to repay the loan would come from Baninter to the detriment of Baninter), and in fact did not do so. The loan was repaid in or about April 2002 with funds furnished by Baninter–not Interduty–through a wire transfer to Miami. The end result was that $504,000 of stolen funds was transferred from Baninter to Interduty using a United States loan at BankAtlantic in Miami.

(n) Through a scheme implemented by Alvarez Renta and Baez Figueroa, Baninter established a letter of credit in the amount of $1,500,000 in favor of BankAtlantic to guarantee a $1,500,000 United States loan made to Interduty by BankAtlantic in Miami. At no time did Interduty intend to repay this loan with its own funds (instead intending at all times that the funds to repay the loan would come from Baninter to the detriment of Baninter), and in fact did not do so. The loan was repaid in or about May 2002 with funds furnished by Baninter–not Interduty–through a wire transfer to Miami. The end result was that $1,500,000 of stolen funds was transferred from Baninter to Interduty using a United States loan at BankAtlantic in Miami.

(o) Through a scheme implemented by Alvarez Renta and Baez Figueroa, Baninter established a letter of credit in the amount of $750,000 in favor of BankAtlantic to guarantee a $750,000 United States loan made to Interduty by BankAtlantic in Miami. At no time did Interduty intend to repay this loan with its own funds (instead intending at all times that the funds to repay the loan would come from Baninter to the detriment of Baninter), and in fact did not do so. The loan was repaid in or about May 2002 with funds furnished by Baninter–not Interduty–through a wire transfer to Miami. The end result was

-13-

that $750,000 of stolen funds was transferred from Baninter to Interduty using a United States loan at BankAtlantic in Miami.

(p)     Through a scheme implemented by Alvarez Renta and Baez Figueroa, Baninter established a letter of credit in the amount of $400,000 in favor of BankAtlantic to guarantee a $400,000 United States loan made to Interduty by BankAtlantic in Miami.   At no time did Interduty intend to repay this loan with its own funds (instead intending at all times that the funds to repay the loan would come from Baninter to the detriment of Baninter), and in fact did not do so.  The loan was repaid in or about June 2002 with funds furnished by Baninter–not Interduty–through a wire transfer to Miami.  The end result was that $400,000 of stolen funds was transferred from Baninter to Interduty using a United States loan at BankAtlantic in Miami.

(q)     Through a scheme implemented by Alvarez Renta and Baez Figueroa, in or about June 2002, Baninter loaned $1,200,000 to Bankinvest through wires to Bankinvest's account at International Bank of Miami.  At no time did Bankinvest intend to repay this loan with its own funds (instead intending at all times that the funds would come from Baninter to the detriment of Baninter), and in fact did not do so.  The end result was that $1,200,000 of stolen funds was transferred from Baninter to Bankinvest using an account at International Bank of Miami.

(r)     Through a scheme implemented by Alvarez Renta and Baez Figueroa, in or about June 2002, Baninter loaned $1,600,000 to Bankinvest through wires to Bankinvest's account at International Bank of Miami.  At no time did Bankinvest intend to repay this loan with its own funds (instead intending at all times that the funds would come from Baninter

-14-

to the detriment of Baninter), and in fact did not do so.  The end result was that $1,600,000 of stolen funds was transferred from Baninter to Bankinvest using an account at International Bank of Miami.

(s)     Through a scheme implemented by Alvarez Renta and Baez Figueroa, in or about August 2002, Baninter loaned $1,100,000 to Bankinvest through wires to Bankinvest's account at International Bank of Miami.  At no time did Bankinvest intend to repay this loan with its own funds (instead intending at all times that the funds would come from Baninter to the detriment of Baninter), and in fact did not do so.  The end result was that $1,100,000 of stolen funds was transferred from Baninter to Bankinvest using an account at International Bank of Miami.

(t)     Through a scheme implemented by Alvarez Renta and Baez Figueroa, Baninter established a letter of credit in the amount of $1,530,000 in favor of International Bank of Miami to guarantee a $1,530,000 United States loan made to Bankinvest by International Bank of Miami.   At no time did Bankinvest intend to repay this loan with its own funds (instead intending at all times that the funds to repay the loan would come from Baninter to the detriment of Baninter), and in fact did not do so.  The loan was repaid in or about September 2002 with funds furnished by Baninter–not Bankinvest–through a wire transfer to Miami.  The end result was that $1,530,000 of stolen funds was transferred from Baninter to Bankinvest using a United States loan at International Bank of Miami.

(u)     Through a scheme implemented by Alvarez Renta and Baez Figueroa, on or about January 17, 2003, Baninter established a letter of credit in the amount of $6,200,000 to guarantee a United States loan made by International Bank of Miami to Bankinvest

-15-

"and/or" Interduty. At the time that the letter of credit was established, and the funds were extended by International Bank of Miami, Bankinvest and Interduty never intended to repay the loans to International Bank of Miami, but would have International Bank of Miami draw on the letter of credit that guaranteed the loan. Bankinvest and Interduty did not pay International Bank of Miami, and the end result was that $1,200,000 was transferred from Baninter to Bankinvest using a United States loan at International Bank of Miami.

32.    In order to misrepresent, mislead and perpetuate the fraud, a number of the transactions described above were kept off of Baninter's books. On others transactions, Alvarez Renta executed promissory notes in an attempt to categorize the scheme as loans from Baninter to Bankinvest or Interduty, even though there was no intent for these "loans" to be paid by Bankinvest or Interduty.

33.    Absent the fraud orchestrated by Alvarez Renta, Baninter would not have made any of the transfers at issue.

34.    By engaging in the foregoing scheme involving letters of credit and fraudulent loans, Alvarez Renta, as well as his companies, Bankinvest and Interduty, intentionally participated in a scheme, using the wires, to defraud Baninter of money by means of material misrepresentations and omissions. Baninter reasonably relied on misrepresentations and material omissions made by Alvarez Renta made in furtherance of the fraudulent scheme, and Baninter suffered injury as a result of the fraud in the amounts of the moneys that Alvarez Renta fraudulently procured from Baninter.

35.    Through the foregoing conduct, Alvarez Renta, as well as his companies, Bankinvest and Interduty, having devised, and intending to devise, a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and

promises, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, and signals for the purpose of executing such scheme and artifice to defraud, in violation of 18 U.S.C. § 1343.

36.     The foregoing scheme, and each act committed in furtherance thereof, constitutes violations of the National Stolen Property Act, 18 U.S.C. §§ 2314 and 2315, in that:

(a)     Alvarez Renta, as well as his companies, Bankinvest and Interduty, transported, transmitted, and transferred in interstate and foreign commerce goods and money, of the value of $5,000 or more, knowing the same to have been stolen, converted and taken by fraud, in violation of 18 U.S.C. § 2314; and

(b)     Alvarez Renta, as well as his companies, Bankinvest and Interduty, received and disposed of goods and money of the value of $5,000 or more, which have crossed a state and United States boundary after having been stolen, unlawfully converted, and taken, knowing the same to have been stolen, unlawfully converted, and taken, in violation of 18 U.S.C. § 2315.

## C.     The Scheme to Transfer Assets to Wadeville's BankAtlantic Account in Miami

37.     In or about late March 2003, in light of the fact that conditions at Baninter continued to deteriorate and a proposed sale of the bank to a third party would likely not be consummated, Alvarez Renta implemented a further part of the scheme by arranging payments to be made to one of his other companies, Wadeville, using funds wrongfully taken from Baninter.

38.     In or about late March 2003, Bankinvest delivered checks drawn from its account at Baninter (which were illicitly funded with stolen moneys belonging to Baninter and not Bankinvest) to Quisqueyana, Agente de Cambio, CxA ("Quisqueyana"), a money exchange agency in the

-17-

Dominican Republic, with specific instructions from Alvarez Renta (a) to exchange the Dominican pesos into United States dollars and (b) to wire the dollars into Wadeville's account at BankAtlantic in Miami for Alvarez Renta's use.

39.     In furtherance of the scheme, the following was done:

(a)     On or about March 20, 2003, a check for 53,000,000 Dominican pesos from the Bankinvest account at Baninter was delivered to Quisqueyana, where the money was exchanged to US$2 million and wired to Wadeville's account at BankAtlantic in Miami. Quisqueyana used Wachovia Bank in Florida to wire the illicit funds to BankAtlantic.

(b)     On or about March 21, 2003, a check for 51,000,000 Dominican pesos from the Bankinvest account at Baninter was delivered to Quisqueyana, where the money was exchanged to US$2 million and wired to Wadeville's account at BankAtlantic in Miami. Quisqueyana used Wachovia Bank in Florida to wire the illicit funds to BankAtlantic.

(c)     On or about March 24, 2003, a check for 49,600,000 Dominican pesos from the Bankinvest account at Baninter was delivered to Quisqueyana, where the money was exchanged to US$2 million and wired to Wadeville's account at BankAtlantic in Miami. Quisqueyana used Wachovia Bank in Florida to wire the illicit funds to BankAtlantic.

(d)     On or about March 24, 2003, a check for 24,800,000 Dominican pesos from the Bankinvest account at Baninter was delivered to Quisqueyana, where the money was exchanged to US$1 million and wired to Wadeville's account at BankAtlantic in Miami. Quisqueyana used Wachovia Bank in Florida to wire the illicit funds to BankAtlantic.

(e)     On or about March 25, 2003, a check for 24,800,000 Dominican pesos from the Bankinvest account at Baninter was delivered to Quisqueyana, where the money was

exchanged to US$1 million and wired to Wadeville's account at BankAtlantic in Miami. Quisqueyana used Wachovia Bank in Florida to wire the illicit funds to BankAtlantic.

(f)    On or about March 26, 2003, checks for 24,800,000 Dominican pesos and 24,400,000 Dominican pesos from the Bankinvest account at Baninter were delivered to Quisqueyana where the money was exchanged to US$2 million and wired to Wadeville's account at BankAtlantic in Miami.  Quisqueyana used Wachovia Bank in Florida to wire the illicit funds to BankAtlantic.

(g)    On or about March 26, 2003, a check for 61,500,000 Dominican pesos from the Bankinvest account at Baninter was delivered to Quisqueyana, where a portion of the money was exchanged to US$500,000 and wired to Wadeville's account at BankAtlantic in Miami.

40.    After the money reached the account at BankAtlantic, Alvarez Renta directed BankAtlantic to pay invoices and personal expenses on his behalf using funds in the account.

41.    The foregoing scheme, and each act committed in furtherance thereof, constitutes money laundering within the meaning of 18 U.S.C. §§ 1956 and 1957 in that:

(a)    Defendants Alvarez Renta and Wadeville, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, conducted and attempted to conduct such financial transactions which in fact involved proceeds of a specified unlawful activity, namely wire fraud (18 U.S.C. § 1343), transportation of stolen goods (18 U.S.C. § 2314), and fraud against a foreign bank (18 U.S.C. § 1956(c)(7)(iii)), knowing that the transactions were designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, and the control of

-19-

the proceeds of the foregoing specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(I);

(b)      Defendants Alvarez Renta and Wadeville transported, transmitted, and transferred, and attempted to transport, transmit, and transfer, monetary instruments and funds to a place in the United States from and through a place outside the United States knowing that the monetary instruments and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, namely wire fraud (18 U.S.C. § 1343), transportation of stolen goods (18 U.S.C. § 2314), and fraud against a foreign bank (18 U.S.C. § 1956(c)(7)(iii)), in violation of 18 U.S.C. § 1956(a)(2)(B)(I); and

(c)      Defendants Alvarez Renta and Wadeville, in an offense that took place in the United States and by a United States person, knowingly engaged, and attempted to engage, in monetary transactions in criminally derived property of a value of greater than $10,000, which was derived from a specified unlawful activity, namely wire fraud (18 U.S.C. § 1343), transportation of stolen goods (18 U.S.C. § 2314), and fraud against a foreign bank (18 U.S.C. § 1956(c)(7)(iii)), in violation of 18 U.S.C. § 1957.

-20-

**COUNT I - Violation of 18 U.S.C. §1962(d) - Conspiracy to Violate § 1962(c)**
**(Alvarez Renta, Bankinvest, Interduty, and Wadeville)**

42.     Plaintiff realleges Paragraphs 1 through 41.

43.     At all relevant times, Baninter was an enterprise as defined in 18 U.S.C. § 1961 and was engaged in, and its activities affected, interstate and foreign commerce. Such enterprise furnished a vehicle for the commission of a pattern of racketeering activity.

44.     Alvarez Renta, Baez Figueroa, and other wrongdoers conspired, confederated, and agreed with each other to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

45.     Specifically, Alvarez Renta, Baez Figueroa, and other wrongdoers conspired, confederated, and agreed with each other to conduct and participate in the conduct of the affairs of Baninter (the "Enterprise") through a pattern of racketeering activity, and they agreed that two or more racketeering acts, including the racketeering acts referred to in Paragraphs 31, 39, and 40–which constitute violations of 18 U.S.C. § 1343 (the federal wire fraud statute), 18 U.S.C. §§ 2314 and 2315 (the transportation and receipt of stolen property statutes), 18 U.S.C. § 1956 (the federal money laundering statute), and 18 U.S.C. § 1957 (the monetary transaction in criminally derived property statute)–would be committed on behalf of the conspiracy.

46.     Alvarez Renta's violation of § 1962(d) was related to, and committed within the course of, his employment with Bankinvest; was committed in furtherance of the business of Bankinvest; and was authorized and acquiesced in by Bankinvest. In addition, Bankinvest benefitted from Alvarez Renta's violation of Section 1962(d). Thus, Bankinvest is liable for violating Section 1962(d) under respondeat superior.

-21-

47.     Alvarez Renta's violation of Section 1962(d) was related to, and committed within the course of, his status as an agent of Interduty; was committed in furtherance of the business of Interduty; and was authorized and acquiesced in by Interduty.  In addition, Interduty benefitted from Alvarez Renta's violation of Section 1962(d).  Thus, Interduty, the principal party, is liable based on the conduct of Alvarez Renta, its agent.

48.     Alvarez Renta's violation of Section 1962(d) was related to, and committed within the course of, his status as an agent of Wadeville; was committed in furtherance of the business of Wadeville; and was authorized and acquiesced in by Wadeville.  In addition, Wadeville benefitted from Alvarez Renta's violation of Section 1962(d).  Thus, Wadeville, the principal party, is liable based on the conduct of Alvarez Renta, its agent.

49.     Plaintiff has been injured in its business and property as a direct and proximate result of the foregoing violation of 18 U.S.C. § 1962(d).

WHEREFORE, Plaintiff demands judgment, jointly and severally, against Defendants Alvarez Renta, Bankinvest, Interduty, and Wadeville pursuant to 18 U.S.C. § 1964 for treble damages, interest, attorney's fees, the costs of this action, and such other and further relief as the Court shall deem just and appropriate.

## COUNT II - Violations of 18 U.S.C. § 1962(a)
### (Alvarez Renta and Bankinvest)

50.     Plaintiff realleges Paragraphs 1 through 41.

51.     At all relevant times, Bankinvest was an enterprise as defined in 18 U.S.C. § 1961, and was engaged in, and its activities affected, interstate and foreign commerce.

52.     As described above, Alvarez Renta and Baez Figueroa stole and wrongfully converted millions of dollars from Baninter through fraudulent acts.

53.     In engaging in the transactions set forth in Paragraph 31 which Alvarez Renta implemented, the transfer of funds from Baninter to the accounts in financial institutions in the United States occurred via wire. These unlawful wire transfers violated 18 U.S.C. § 1343.

54.     The transactions described in Paragraph 31, which Alvarez Renta implemented with knowledge that moneys were stolen, converted, and taken by fraud and which Alvarez Renta and Bankinvest caused to occur, were effectuated by the transfer of funds from Baninter, in the Dominican Republic, into accounts in financial institutions in the United States, thus violating 18 U.S.C. §§ 2314 and 2315.

55.     Alvarez Renta, Baez Figueroa, and other wrongdoers therefore engaged in a pattern of racketeering activity.

56.     Alvarez Renta, Baez Figueroa, and other wrongdoers used and invested the income and proceeds generated from this pattern of racketeering activity in the operation of Bankinvest (the "Investment Enterprise") in violation of 18 U.S.C. § 1962(a).

57.     This violation of Section 1962(a) was related to, and committed within the course of, Alvarez Renta's employment with Bankinvest; was committed in furtherance of the business of Bankinvest; and was authorized and acquiesced in by Bankinvest. In addition, Bankinvest benefitted from Alvarez Renta's violation of Section 1962(a). Thus, Bankinvest is liable as a defendant for violating Section 1962(a) under respondeat superior.

58.     Plaintiff has been injured in its business and property as a direct and proximate result of the foregoing violation of 18 U.S.C. § 1962(a) through the Investment Enterprise.

-23-

WHEREFORE, Plaintiff demands judgment, jointly and severally, against Defendants Alvarez Renta and Bankinvest pursuant to 18 U.S.C. §1964 for treble damages, interest, attorney's fees, the costs of this action, and such other and further relief as the Court shall deem just and appropriate.

### COUNT III - Violation of 18 U.S.C. § 1962(d)- Conspiracy to Violate 18 U.S.C. § 1962(a) (Alvarez Renta and Bankinvest)

59.     Plaintiff realleges Paragraphs 1 through 41.

60.     Alvarez Renta, Baez Figueroa, and other wrongdoers conspired, confederated, and agreed with each other to violate 18 U.S.C. § 1962(a) in violation of 18 U.S.C. §1962(d).

61.     Specifically, Alvarez Renta, Baez Figueroa, and other wrongdoers conspired, confederated, and agreed with each other to use and invest income and proceeds generated from a pattern of racketeering activity, which constituted violations of and the federal wire fraud statute, 18 U.S.C. § 1343, and the transportation and receipt of stolen property statutes, 18 U.S.C. §§ 2314 and 2315, in the operation of the Investment Enterprise.

62.     Alvarez Renta's violation of § 1962(d) was related to, and committed within the course of, his employment with Bankinvest; was committed in furtherance of the business of Bankinvest; and was authorized and acquiesced in by Bankinvest. In addition, Bankinvest benefitted from Alvarez Renta's violation of § 1962(d). Thus, Bankinvest is liable as a defendant for violating Section 1962(d) under respondeat superior.

63.     Plaintiff has been injured in its business and property as a direct and proximate result of the foregoing violation of 18 U.S.C. §1962(d).

-24-

WHEREFORE, Plaintiff demands judgment, jointly and severally, against Defendants Alvarez Renta and Bankinvest pursuant to 18 U.S.C. §1964 for treble damages, interest, attorney's fees, the costs of this action, and such other and further relief as the Court shall deem just and appropriate.

**COUNT IV - Fraudulent Transfers**
**(Alvarez Renta, Bankinvest and Wadeville)**

64.     Plaintiff realleges Paragraphs 1 through 41.

65.     Plaintiff was and is a creditor within the meaning of Fla. Stat. § 726.102.

66.     Bankinvest was and is a debtor of Plaintiff within the meaning of Fla. Stat. § 726.102.

67.     By Bankinvest's wrongful taking of funds from Baninter, which did not belong to Bankinvest, to fund Bankinvest's checking account at Baninter, Bankinvest became a creditor of Baninter for purposes of this claim.

68.     Subsequent to the taking of funds from Baninter, Bankinvest made fraudulent transfers as to Baninter with actual intent to hinder, delay, and defraud Baninter.

69.     The transfers of money to Miami from Bankinvest to Wadeville and from Wadeville to or for the benefit of Alvarez Renta described above in Paragraphs 38 through 40 were designed to, and did, defraud Baninter.

WHEREFORE, Plaintiff requests an order from this Court (a) avoiding the transfers made by Bankinvest to Wadeville, (b) attaching the assets transferred, (c) enjoining against further disposition against Bankinvest, Wadeville, or any transferee (including, but not limited to, Alvarez Renta, Bankinvest, Interduty, and any affiliated entities) of the transferred assets, and (d) awarding interest, the costs of this action and such further relief as this Court shall deem proper.

-25-

## DEMAND FOR JURY TRIAL

Plaintiff demands jury trial on all issues triable as of right by jury.


Dated: June 22, 2004.

TEW CARDENAS LLP
Attorneys for Plaintiff
Miami Center, 26th Floor
201 S. Biscayne Boulevard
Miami, Florida  33131-4336
Telephone:     (305) 536-1112
Fax:              (305) 536-1116

By: _____

**C. THOMAS TEW, P.A.**
Florida Bar No.  098160
E-Mail: tt@tewlaw.com
**JOSEPH A. DEMARIA**
Florida Bar No. 764711
E-Mail: jad@tewlaw.com
**MATIAS R. DORTA**
Florida Bar No. 770817
E-Mail:  mrd@tewlaw.com
**JONATHAN ETRA**
Florida Bar No. 686905
E-Mail: je@tewlaw.com
**BRYAN T. WEST**
Florida Bar No. 0083526
E-Mail: btw@tewlaw.com

-26-

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via U.S. Mail on this 22nd day of June, 2004 upon: Laura Besvinick, Esq., Attorney for Luis Alvarez Renta and Wadeville Investments, Ltd., Hogan & Hartson, LLP., 1111 Brickell Avenue, Miami, Florida 33131; Anthony J. Barranco, Esq., Attorney for Luis Alvarez Renta, Barranco, Kircher & Vogelsang, P.A.,150 West Flagler Street, Suite 1400, Miami, Florida 33130-1537; Bankinvest S.A., Avenida Winston Churchill, No. 62, Santo Domingo, Republica Dominicana; and Arias, Fabrega & Fabrega Trust, Co., BVI Limited, as Registered Agent for Interduty Free Ltd., 325 Waterfront Drive, Omar Hodge Building, 2nd Floor, Wickham Cay, Road Town Tortola, British Virgin Islands.

Matias R. Dorta

@PFDesktop\::ODMA/MHODMA/MIAMI;409990;1

-27-